**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| PAVEL MOLODETSKIY, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 3:07-1046** |
| | ) | **Judge Echols** |
| NORTEL NETWORKS SHORT-TERM | ) | |
| AND LONG-TERM DISABILITY | ) | |
| PLAN, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Plaintiff Pavel Molodetskiy brings this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, seeking judicial review of the decision made by Defendant Nortel Networks Inc. Short-Term Disability Plan and Long-Term Disability Plan ("the Plan") to terminate Plaintiff's long-term disability benefits. The Plan is self-funded by Nortel Networks, a Tennessee corporation, through an ERISA trust, but the Plan is administered by Prudential. Plaintiff filed a Motion for Judgment on the ERISA Record (Docket Entry No. 14), to which the Plan filed a response in opposition (Docket Entry No. 19), Plaintiff filed a reply (Docket Entry No. 23), and the Plan filed a surreply (Docket Entry No. 26). The Plan also filed its own Motion For Judgment On The Administrative Record (Docket Entry No. 16), to which Plaintiff filed a response in opposition (Docket Entry No. 18).

## I. FACTS

Plaintiff is a Ukrainian-born California resident who has a college degree and lives with his parents. He began work with Nortel Networks, Inc. as a systems design engineer in March 2001. (AR 50, 344, 347.) Plaintiff was a member of a computer hardware diagnostic team and attended numerous meetings. (AR 130-132.) He worked at multiple computer workstations on a random

schedule when time slots were available, including late evenings, early mornings and weekends. Plaintiff worked with manufacturing and hardware engineers at other locations, he trained manufacturing staff to use diagnostic software (mostly in Asia), and he worked with customers. He was required to sit or stand and type in often very uncomfortable positions. His job required him to work 40 to 50 hours a week and it involved overtime, stress, responsibility and teamwork. (AR 54.)

As a Nortel Networks employee, Plaintiff was covered under the company's group disability plan. The Plan defined "disability" as follows:

> You are entitled to benefits from the LTD Plan only if you are considered "Totally Disabled." You are considered Totally Disabled initially when the Claims Administrator determines that you are unable to perform the essential functions of your job and this finding is supported by documentation from your Physician. This means that you cannot perform the work you were normally performing at the time of your disability, with or without reasonable accommodations, due to the limitations resulting from your Illness or Injury. . . .

> The proof that your Physician submits must be written proof of objective clinical documentation (i.e., lab tests, x-rays, medical reports, etc.) of your Total Disability. The Claims Administrator will approve or deny your Claim for LTD benefits at its discretion. Independent Medical Evaluations (IMEs) may also be required (either additional physical examinations and medical testing or file reviews of existing medical records), at the Company's expense, in order to arrive at this final determination. Your benefit will be denied if you do not provide such objective proof of your Claim within the required timeframe.

> During the first 18 months of a covered Total Disability (from the first day of STD), you will be considered unable to work if you cannot perform the work you were normally performing at the time of your disability, with or without reasonable accommodations, due to the limitations resulting from your Illness or Injury.

> After the first 18 months of covered Total Disability (from the first day of STD), you will be considered unable to work if you are unable to perform any reasonable occupation. A "reasonable occupation" is any job you are or could become qualified to do with your education, training, or experience.

> Disabilities due to an Illness or Injury that, as determined by the Claims Administrator, are primarily based on self-reported symptoms, have a limited pay

2

period during your lifetime. The pay period limitations are at the discretion of the Claims Administrator. If objective medical and clinical evidence is not submitted or changes in the treatment plan or more aggressive treatment is not commenced within a reasonable period, the benefit will be terminated.

(AR 20.) The Plan also included a 24-month behavioral illness limitation and provided for a written appeal of a denial of short-term or long-term benefits within 180 days of the denial of the claim. The Plan permitted a claimant to provide additional information relevant to the claim. Further,

[a] full review of the information in the Claim file and any new information submitted to support the appeal will be conducted by the Prudential Appeals Review Unit. The Claim decision will be made by a member of the Prudential Claims Management Team. The Prudential Appeals Review Unit and Claims Management Team members are made up of individuals not involved in the initial benefit determination. This review will not give any deference to the initial benefit determination.

(AR 31.) If not satisfied with the outcome of the first-level appeal, the Plan permitted the claimant to request within sixty days a second-level appeal from the Employee Benefits Committee. (Id.)

During employment with Nortel Networks, Plaintiff suffered low back pain radiating into his legs. His medical treatment included epidural steroid injections, physical therapy, and referral to a pain clinic in 2002. (Id.) On November 4, 2003, when Plaintiff was 31 years old, he was again seen by his physiatrist, Dr. Millard, complaining of increasing low back pain radiating into the right leg and increasing arm pain extending into his fingers. (AR 133.) Plaintiff attributed his increased pain to an automobile accident on August 12, 2003; Plaintiff's vehicle was struck from behind. (Id.) Plaintiff told Dr. Millard he had tried chiropractic treatments that seemed to help temporarily, but he had not had any physical therapy or an MRI. Clinical examination revealed decreased cervical lordosis.[1] Cervical forward flexion and extension and bilateral extension/rotation provoked neck

---

[1]Exaggerated forward curvature of the lumbar and cervical regions of the spinal column. Merriam Webster Medline Plus®, http://www.nlm.nih.gov/medlineplus/mplusdictionary.html, hereinafter shortened to Merriam Webster Medline Plus®. Definitions of medical terms are not

pain. Neurological examination was normal in the bilateral upper extremeties, but Tinel sign was present over the ulnar nerve at the elbow, with reproduction of fourth and fifth digit paresthesias.[2] (AR 134.) Dr. Millard's impression was C4 through C6 discogenic/mechanical pain; possible C7 radiculitis[3]; ulnar neuritis[4] at the elbow, bilaterally. (Id.) Dr. Millard recommended an MRI of the cervical spine and a repeat MRI of the lumbar spine and started Plaintiff on physical therapy.

Plaintiff stopped working on November 13, 2003. Plaintiff attended physical therapy sessions until December 22, 2003, when he ended the sessions before treatment was completed. Plaintiff felt the treatments did not help him.

Plaintiff applied for short-term disability benefits, which the Plan paid for twenty-six (26) weeks starting November 18, 2003. (AR 21, 51, 206.) According to Dr. Millard, Plaintiff's diagnosis at that time was herniated disc and radiculopathy.[5]

On November 24, 2003, an MRI of the lumbar spine showed at L4-5:

The intervertebral disc is mildly decreased in height and moderately decreased in signal intensity. Mild annular[6] bulge of the intervertebral disc is seen with a broad-based right lateral disc protrusion with annular fissuring. Secondary moderate right

_____

included in the Administrative Record, but are supplied by the Court.

[2]Sensation of pricking, tingling, or creeping on the skin having no objective cause and usually associated with injury or irritation of a sensory nerve or nerve root. Merriam Webster Medline Plus®.

[3]Inflammation of a nerve root. Merriam Webster Medline Plus®.

[4]Inflammatory or degenerative lesion of the ulnar nerve marked especially by pain, sensory disturbances, and impaired or lost reflexes. Merriam Webster Medline Plus®.

[5]Any pathological condition of the nerve roots. Merriam Webster Medline Plus®.

[6]Of, relating to, or forming a ring. Merriam Webster Medline Plus®.

4

L4-5 neural foraminal[7]  narrowing is seen, with mild posterolateral[8] displacement of the exiting right L4 nerve root.  No central canal stenosis.[9]  Mild left L4-5 neural foraminal narrowing is seen.  Mild facet joint degenerative changes are demonstrated.

(AR 142.)  The radiologist's impression was:  "1.  Broad-based right lateral protrusion of the L4-5 disc with a right posterolateral annular fissure.  Secondary moderate right L4-5 neural foraminal narrowing with mild posterolateral displacement of the exiting right L4 nerve root.  2.  Very small central protrusion at the T11-12 intervertebral disc partially effacing the anterior thoracic subarachnoid space."  (Id.)  The MRI of the cervical spine revealed "[m]ild broad based annular bulges are identified at C3-C4, C4-C5 and C5-C6 without central canal or neural foraminal narrowing.  At C2-C3, C6-C7, and C7-T1, no disc bulge, central canal narrowing or neural foraminal narrowing is identified."  (AR 143.)  Dr. Millard felt there was not much to do for the cervical spine, but he recommended lumbar epidural injections (AR 136-137), which Plaintiff had done at right L4, L5 and S1.  Plaintiff later reported to his pain management specialist, Dr. Gracer, that the epidural injections helped his pain two to three weeks.

On December 15, 2003, Plaintiff had a normal EMG[10] of the left arm.  Plaintiff saw Dr. Wall, an orthopedic surgeon, on January 23, 2004 for left medial elbow pain.  On February 1, 2004, Dr. Brody performed a left ulnar nerve entrapment surgery for carpel tunnel syndrome.  (AR 51.)

---

[7]A small opening, perforation, or orifice.  Merriam Webster Medline Plus®.

[8]Posterior and lateral in position or direction.  Merriam Webster Medline Plus®.

[9]A narrowing or constriction of the diameter of a bodily passage or orifice.  Merriam Webster Medline Plus®.

[10]Electromyogram; a test done to diagnose neuromuscular disorders.  Merriam Webster Medline Plus®.

5

On February 26, 2004, Plaintiff was seen in the Stanford University Pain Management Center where Dr. Navani recommended physical therapy, trigger point injections, and Flexeril, a muscle relaxant for Plaintiff's back pain. (AR 109, 542.) Dr. Navani suggested that Plaintiff continue to see his physiatrist for medical therapy, obtain counseling to cope with pain, and utilize biofeedback and relaxation techniques. On March 18, 2004, Plaintiff underwent occupational therapy for left hand rehabilitation. (AR 51.)

By April 1, 2004, Plaintiff was seeing a psychiatrist, Dr. Brauer. Plaintiff reported his grandfather, a pediatrician, had died in a motor vehicle accident in 2002, and his mother was severely anxious and moderately depressed with passive suicidal thoughts. Plaintiff's diagnosis was major depressive disorder and chronic pain syndrome. Dr. Brauer prescribed Effexor, 75 mg, an antidepressant. During a re-check on May 7, 2004, Plaintiff had moderate depression and continued disability. Dr. Brauer increased the Effexor dosage and added Elavil 25 mg, another antidepressant, at bedtime. Three days later, on May 10, 2004, Dr. Brauer again diagnosed moderate depression and anxiety and increased the Effexor dosage a second time.

Plaintiff's short-term disability benefits terminated and long-term disability benefits began on May 18, 2004. Plaintiff's adjusted monthly benefit was $4,628.53. (AR 51, 193-195.)

On May 25, 2004, Plaintiff had a discogram[11] at L3-4, L4-5, and L5-S1 conducted by Dr. Gracer at Tri-Valley Surgery Center. Dr. Gracer's appraisal was that Plaintiff's L3-4 and L5-S1 disks were normal. However, as to the L4-5 disk, he noted:

> posterolateral bulge and probable fissure. There was no obvious epidural leak. Injection of this disk re-created the patient's pain. The fact that it was not more than 4 on a scale of 1 to 10 may indicate the fact that most of his pain is coming from the

---

[11]A radiograph of an intervertebral disk made after injection of a radiopaque substance. Merriam Webster Medline Plus®.

6

actual impingement on the nerve root, rather than it being discogenic in and of itself.

(AR 81.) Dr. Gracer stated: "The patient's pain is coming from the L4-5 disk, most likely from impingement on the nerve root. The next step would be to perform a selective nerve root block, which will completely ablate his pain and induce anesthesia in the area of his ongoing symptomology. I feel this test is positive and he will be an excellent candidate for percutaneous disc decompression." (AR 81.)

A CT scan of the lumbar spine performed the same day after the discogram showed no disc herniation at the L4-5 level, or spinal or foraminal stenosis. The radiologist's impression was: "Probably normal L4-5 discogram, although there is some contrast seen extending to the right lateral disc margin, presumed to be technical. Clinical correlation suggested." (AR 84.)

On June 8, 2004, Plaintiff's diagnosis was "1. L4-5 disk protrusion with positive discogram showing pain and disk bulge at that level. 2. Lumbar radiculitis, consistent with the L5 nerve root." Plaintiff was given right L5 and right S1 transforaminal selective epidural injections. Dr. Gracer commented:

> Probable L4-5 disk protrusion with a positive discogram at that level. It is unclear from this injection whether or not selectively anesthetizing the right L5 nerve root took away all of his pain. This is unclear due to the fact that the patient needs to be more ambulatory in order to tell whether or not this area was helped.

(AR 87.) He also stated: "Injection of the right S1 nerve did not significantly contribute to right leg pain reduction." (Id.)

On June 7, 2004, Dr. Brauer, the psychiatrist, again increased Plaintiff's Effexor dosage and reported that Plaintiff was disabled through August 31, 2004. However, on August 28, 2004, Dr. Brauer stated he would not support disability after August 31, 2004. (AR 52.)

On August 19, 2004, on referral by Dr. Light, Plaintiff underwent an EMG/NCS of the bilateral upper and lower extremities to evaluate for radiculopathy versus a peripheral neuropathy.[12] (AR 123-129.)  The conclusion was "evidence of a chronic right C5 cervical radiculopathy with chronic and mild persistent denervation[13] . . . evidence of a mild bilateral chronic L4 lumber radiculopathy with chronic and mild persistent denervation . . . and evidence of a mild left peroneal mononeuropathy."[14]  (AR 129.)

On September 12, 2004, Plaintiff returned to work, but he did not finish out the day.  Plaintiff applied for Social Security disability benefits on September 29, 2004.  (AR 52.)  On December 17, 2004, the Social Security Administration denied disability benefits after reviewing medical information.  Plaintiff wrote and filed his own appeal letter on January 3, 2005.  (AR 52.)  On February 18, 2005, Prudential notified Plaintiff that his initial 18-month period of disability benefits would end on May 17, 2005 and the company would be undertaking a "thorough evaluation" to determine his eligibility for benefits beyond that date.  (AR 186-188.)

On February 28, 2005, Dr. Gracer completed an Attending Physician's Statement.  (AR 349-353.)  He reported that Plaintiff's primary clinical diagnosis was "Lumbar disk protrusions" and the secondary diagnoses were "lumbar radiculopathy" and "chronic pain syndrome."  For relevant test procedures performed, he listed lumbar and cervical MRI, discogram at L3-4, L4-5, nerve root block injections, and bilateral EMG nerve conduction studies.  He stated Plaintiff had "severe radiation

---

[12]Any pathological condition of the nerve roots versus a disease or degenerative state of the peripheral nerves in which motor, sensory or vasomotor nerve fibers may be affected and which is marked by muscle weakness and atrophy, pain and numbness.  Merriam Webster Medline Plus®.

[13]To deprive of a nerve supply (as by cutting a nerve).  Merriam Webster Medline Plus®.

[14]Nerve disease affecting a single nerve of, relating to, or located near the fibula.  Merriam Webster Medline Plus®.

to right leg originating in lower back; shoulder and neck pain causing radiation and arm pain; significant diminishment of lower and upper activities." (AR 350.) Dr. Gracer noted Plaintiff had a "severe problem when sitting, standing," prolonged walking was also affected, and over the prior year Plaintiff had not experienced much improvement in his condition. His plan was to continue medications, lumbar epidural injections, and various therapies. He opined that Plaintiff could lift and carry up to twenty pounds occasionally, climb, bend, kneel, squat, crawl and reach occasionally and balance frequently. He stated Plaintiff could sit with rest 1hour, stand with rest 1 hour, and walk with rest 2hours in an 8-hour work day. When asked which job category, ranging from sedentary to very heavy, Plaintiff was capable of performing, Dr. Gracer wrote, "None." (AR 351.) In his opinion, Plaintiff "clearly shows significant pain while sitting/standing, and appears to get fatigued easily. EMG test shows electrodiagnostic evidence of a chronic right C5 cervical radiculopathy and persistent denervation[;] also chronic bilateral L-4 lumbar radiculopathy with persistent denervation." (AR 353, 354.)

On March 11, 2005, Plaintiff had another MRI of the lumbar spine. The radiologist's impression was: "Far right lateral annular tear and protrusion at L4-5 with mild to moderate narrowing of the accompanying neural foramen.[15] No interval change noted from the study of November 24, 2003." (AR 90.)

On May 18, 2005, the Plan terminated Plaintiff's long-term disability benefits. (AR 165-170.) The benefits termination letter stated that Prudential had reviewed medical documentation from Dr. Gracer and Dr. Brauer, medical information in the file and additional information Plaintiff provided about his education, training and work experience. (AR 167.) Prudential determined that Plaintiff's left ulnar nerve problem resolved after surgery. It also reviewed the medical evidence

---

[15]Nerve opening. Merriam Webster Medline Plus®.

9

concerning Plaintiff's back problems and noted Plaintiff was still complaining of radiating right leg pain and shoulder and neck pain radiating to the arms. However, Prudential focused on portions of the "Work Status Form" Dr. Gracer completed on February 28, 2005. The form noted that Plaintiff could lift and carry up to 20 pounds occasionally; climb, bend, kneel, squat, crawl, and reach occasionally; balance frequently; and grasp, push and pull occasionally, but that Plaintiff was unable to do fine manipulation. Based on the medical information reviewed, Prudential decided that these restrictions and limitations appeared to be reasonable given the EMG findings. Prudential did not mention the other limitations placed by Dr. Gracer, including sitting 1hour, standing 1hour, and walking 2 hours in an 8-hour work day, with no functional capacity to do any level of work, from sedentary to heavy. (AR 167-168.)

Instead, Prudential found that Plaintiff had a degree in computer science with prior work experience as a computer programmer, systems engineer, parking attendant and helper in a fried chicken restaurant. Plaintiff's occupation of systems engineer was classified as "light" duty, exerting up to 20 pounds of force occasionally, 10 pounds of force frequently, standing 4 to 8 hours and walking 0 to 4 hours. Prudential noted that "light" work involves sitting most of the time, but may include walking or standing for brief periods of time. Prudential determined that the restrictions and limitations provided by Dr. Gracer supported a finding that Plaintiff was capable of light work, and Plaintiff was doing light work in his prior occupation as a systems engineer at the time he stopped working on November 18, 2003. Although Plaintiff complained subjectively of pain, Prudential applied the "self-reported" symptoms limitation and determined no further benefits were payable for chronic pain complaints. Prudential informed Plaintiff that he could return to his former occupation and even if he could not, he possessed skills that would transfer to alternative

10

occupations, such as directing, controlling and planning; dealing with people and customers, coordinating data; and negotiating.  (AR 168.)

On May 26, 2005, Plaintiff was seen by Dr. Chou at the UCSF Medical Center, Department of Neurological Surgery.  Plaintiff's chief complaint was right leg pain for two and one-half years that was not relieved by multiple conservative treatment modalities.   Dr. Chou noted that radiographic imaging showed Plaintiff had a broad-based disc bulge at L4-5 with some foraminal stenosis at L4-5, secondary to the disc bulge, greater on the right than the left.  He concluded that, "[g]iven the lateral nature of the L4-5 disk herniation, this would impinge upon the right L4 nerve root."  He scheduled a right-sided L4 nerve root block to see if this would help Plaintiff, noting it would be both diagnostic and therapeutic.  He stated that, if Plaintiff received tremendous benefit from the nerve root block,  surgical intervention might consist of a right-sided L4-5 foraminotomy with decompression of the L4 nerve root.  (AR 73.)

On June 22, 2005, Dr. Massey of the Bay Area Pain Center reevaluated Plaintiff for lumbar degenerative disc disease.  He and Plaintiff discussed treatment options, including Nucleoplasty®[16] and obtaining a second surgical opinion with Dr. Kim at Stanford University.  (AR 101.)

On June 24, 2005, Plaintiff underwent a L4 nerve root block at the UCSF Pain Management Center on referral from Dr. Chou.  Dr. Keltner reported that Plaintiff had a history of chronic low back pain with right radiculopathy, and while Plaintiff did not have precipitating injury, he had a long history of heavy lifting as well as some weight lifting.  Plaintiff was taking Neurontin, Vicodin as needed, Flexeril and Lamictal.[17]  (AR 75.)

---

[16]An outpatient, minimally invasive procedure to treat contained herniated disks. http://www.neucleoplasty.com/phyFaq.aspx.

[17]Neurontin is used to treat nerve pain, Vicodin is a narcotic painkiller, and Lamictal is used to treat bipolar disorder.  (AR 112, 116.)

Plaintiff was seen again by Dr. Massey on June 30, 2005 and July 6, 2005. (AR 99-100.) On the latter occasion, Dr. Massey stated Plaintiff's options were to move forward with spine surgery, undergo a minimally invasive disc decompression, consider interdisciplinary functional restoration, or manage on his own. Dr. Massey stated: "My sincere impression at this time is that no matter what is done, the patient will continue to have right lower extremity pain in the S1 distribution." (AR 95.)

On July 19, 2005, Plaintiff returned for followup to Dr. Engstrom at the UCSF Pain Management Center. He reported the May 26, 2005 nerve block at L4 did not help him. Dr. Engstrom wrote: "[G]iven that the patient did not respond to a nerve root block at the L4 level, it is unlikely the patient would respond to surgical intervention because it is questionable whether or not his pain is coming from this L4-5 disc bulge." (AR 77.) He recommended that Plaintiff be evaluated for the etiology of the pain and he also referred Plaintiff to pain management. (Id.)

On July 21, 2005, Plaintiff had a right L4-5 epidural steroid injection and L4 nerve root injection. (AR 96-97.) He reported to Dr. Massey on August 5, 2005 that the L4 nerve root injection gave him 80% pain relief for only one hour after the injection. (AR 92.) Plaintiff and Dr. Massey again reviewed options, including functional restoration, medications, and intermittent use of epidural steroid and selective nerve root injections. He also discussed the possibility of Nucleoplasty® or obtaining an opinion on surgery. (AR 92.) On August 18, 2005, Dr. Massey gave Plaintiff another right L4-5 epidural steroid injection and a right L4 selective nerve root injection. (AR 93.)

On August 19, 2005, Dr. Gracer completed a Physical Residual Functional Capacity Questionnaire. (AR 66-68.) He reported that he had seen Plaintiff once a month since April 2004, and Plaintiff's diagnoses were "L4-5 disc and lumbar radiculopathy." He stated that Plaintiff

12

experienced pain constantly in his lower back and legs, and such pain was severe with sitting, standing and walking. When asked to identify the clinical findings and objective signs, Dr. Gracer reported the L4-5 disk on MRI and the EMG showing L-4 radiculopathy. He reported Plaintiff had tried epidural injections and medications but they were of no help. Dr. Gracer agreed that his patient's impairments lasted or could be expected to last at least twelve months and Plaintiff's impairments (physical impairments plus any emotional impairments) were reasonably consistent with the symptoms and functional limitations described in the evaluation.

Dr. Gracer stated Plaintiff could walk 4 to 6 city blocks without rest or severe pain; he could sit 20 minutes at one time; he could stand 20 to 30 minutes at one time; in an 8-hour period, Plaintiff could sit less than 2 hours and stand/walk about 2 hours; and Plaintiff needed to lie down 2 to 4 times a day for 10 to 30 minutes. Dr. Gracer also stated Plaintiff could lift less than 10 pounds occasionally, 10 pounds rarely and 20 or 50 pounds never. He further stated Plaintiff could occasionally look up and down, flex the neck, turn the head right and left, and hold the head in static position. He also reported Plaintiff's impairments were likely to produce "good days" and "bad days." Plaintiff's symptoms and limitations presented at the beginning of treatment in April 2004, and Dr. Gracer opined that Plaintiff was unable to sustain any full-time work. He concluded, "This patient probably has nerve root injury and chronic neuritis." (AR 68.)

On September 7, 2005, Dr. Massey of the Bay Area Pain Center referred Plaintiff to Dr. Kim at Stanford University. (AR 69.) In the referral letter, Dr. Massey described Plaintiff as having a diagnosis of L4-5 degenerative disc disease with a persistent right L4 radiculopathy. Despite repeated epidural steroid injections and selective nerve root injections, Plaintiff remained significantly symptomatic and wished to follow up with a possible neurosurgical option for the treatment of the problem. Dr. Massey stated Plaintiff was taking Vicodin occasionally, as well as

13

Effexor, Neurontin, Lamictal and Flexeril. He also mentioned that Plaintiff's MRI from "last spring" remained "significantly accurate" and he sent it with the Plaintiff. He asked for Dr. Kim's consultation.

On September 15, 2005, Plaintiff's psychiatrist, Dr. Brauer, completed a psychiatric assessment, noting Plaintiff had been in treatment since April 1, 2004. Plaintiff's reported medications were Effexor, Remeron,[18] and Lamictal. Medication trials had included Topamax, Cymbalta, Paxil, and Neurontin. Dr. Brauer stated Plaintiff's social functioning had decreased, he had persistent negative thoughts, hopelessness and helplessness, poor concentration, decreased emotional range of affect, and persistent sadness. There was, however, no psychotic process and no physical or mental impairments that would interfere with Plaintiff's ability to behave in an emotionally stable manner or ability to sustain an ordinary routine without special supervision or reminders. Dr. Brauer stated Plaintiff had physical and mental impairments that interfered with his regular attendance in a work setting, his ability to function in a structured setting, and his ability to maintain concentration, persistence and pace. Dr. Brauer felt that Plaintiff's inability to sit more than 20 to 30 minutes would interfere with his relationship with co-workers. (AR 312-314.)

On November 10, 2005, Plaintiff was seen by Dr. Kim at Stanford University in the Neurosurgery Spine Clinic. Dr. David Nathan, coordinating with Dr. Kim, stated Plaintiff

> does seem to have disease at L4-5 with desiccation annular tear and some foraminal encroachment due to a far lateral disk. This did not clearly explain all of his pain syndrome. He has been evaluated elsewhere, and there has been no surgical recommendations made, and at this point, we are in agreement. We will hold off on pursuing a surgical intervention in the form of fusion surgery on this patient given the lack of clarity as to whether this would improve him.

---

[18]Used to treat depression.

14

(AR 71.)  Dr. Nathan and Dr. Kim felt surgery could be considered in the future if Plaintiff should have persistent pain and fail "nonoperative consolidative management."  They suggested Plaintiff be referred for anesthesia pain evaluation for a possible medial branch block or selective nerve root block at the L4 level bilaterally and just on the right.  (AR 54.)

Plaintiff retained an attorney and in early November 2005 requested reconsideration of the May 18, 2005 decision to terminate his long-term disability benefits.  (AR 318-323, 328-329.)  In evaluating Plaintiff's request for reconsideration, Prudential referred Plaintiff's file for an independent medical review and requested a physician specializing in occupational medicine.  (AR 157-158.)  The file was sent to Dr. Syrjamaki, who is board-certified in internal medicine and board eligible in occupational medicine.

Dr. Syrjamaki reviewed the medical records and Plaintiff's letters appealing the termination of benefits.  He concluded that Plaintiff "has had extensive diagnostic testing without significant pathology demonstrated in general."  (AR 248.)    He further stated:

> He has had only minimal abnormalities noted on MRI scan as well as discogram.  It appears that his pain complaints have been present the entire time he worked at Nortel Networks. . . .He had had similar pain prior to the motor vehicle accident of August 12, 2003, and although he did feel he had an increase in his low back and right leg pain symptoms as well as neck pain, it appears that this motor vehicle accident did not significantly change those pain complaints. . . . there also does not appear to be any evidence, either on physical examination or diagnostic studies, that would support any disabling nature to his pain complaints. . . .
>
> The nature of his appeal letters suggests that he has a strong somatization disorder,[19] and I do not believe that there has been anything that would support a significant disabling physical basis to his pain complaints.  He has had chronic pain complaints, and I do not believe that his pain complaints have a significant physical basis.

(AR 251.)

---

[19]Conversion of a mental state (as depression or anxiety) into physical symptoms.  Merriam Webster Medline Plus®.

15

Dr. Syrjamaki opined that Plaintiff did not have any physical functional impairment that would prevent him from being employed as a systems engineer for Nortel Networks and stated Plaintiff could do his entire prior job without restrictions. (AR 252.) He stated there were no restrictions on Plaintiff's ability to sit, stand, walk, lift, reach or carry. He also stated there had not been any significant objective finding noted on diagnostic studies or physical examination that would support impairment. Dr. Syrjmaki also concluded there was no evidence of a cognitive impairment or side effects from medication. Finally, he stated:

> I do not believe he is functionally impaired. His job is a light job. He would certainly be able to do his job with even a sit/stand option, et cetera, but I do not believe there is anything in the medical record that would indicate that he has been found to have a definite objective basis for his pain complaints. There does not appear to be a significant physical basis for his complaints of such severe pain complaints. His lack of response to treatment and all the numerous diagnostic studies, which have failed to indicate any significant abnormalities, would also support that there is no functional impairment in this claimant. He has not had any objective abnormalities on exam that would support his subjective pain complaints.

(AR 253.)

On December 21, 2005, Dr. Gerson, a board-certified psychiatrist, conducted an independent medical review. He reviewed the medical evidence in the file as well as a telephone call log. He reports that, on April 15, 2004, Plaintiff stated that his job was

> like an engineer, mostly keyboarding all day. No heavy lifting. Sometimes he worked in the lab sitting at a desk. He has problems sitting and repetitive typing. He has some tingling but it is getting a little better. He also has some neck pain. . . . He said that most of his doctors did not support disability and encouraged him to return to work and that his pain was subjective.

(AR 222.) Dr. Gerson stated that Dr. Brauer's diagnosis of chronic pain syndrome was consistent with the medical record documentation:

> The claimant's report of pain was dramatic in comparison to clinical findings. . . . He reported that his pain was twenty hours a day, everyday, at a level of 7-9, on a scale of 1-10. He reported that "any" activity caused nausea due to "nerve root irritation"

16

and inflammation that required several days of bed rest. He also reported severe headaches that stabilized only if he did not exert himself. Ten different analgesic type medications were tried without success. There was no indication that the claimant misused narcotic analgesics or other medications. In addition to medications, the claimant had thirteen different therapies, such as PT, acupuncture, and chiropractic, without reported relief, according to records from Stanford pain clinic. . . . Importantly, the claimant discontinued physical therapy precipitously and he refused multidisciplinary treatment to manage his reported symptoms. The most recent pain specialist, Dr. Massey, opined, as other previous MD's had, that no matter what was done for the claimant he would still complain of pain.

(AR 233.) Dr. Gerson concluded that Dr. Brauer's notes of psychiatric sessions with Plaintiff did not validate any impairment due to depression, pain, physical symptoms, medication use, or a combination of those factors. According to Dr. Gerson, Dr. Brauer consistently noted that Plaintiff's behavior was appropriate and Dr. Brauer was somewhat inconsistent in what he documented on insurance forms and in his clinical notes. Dr. Brauer described more intense depression and anxiety than his notes reflected. He also stated he would not support disability after August 2004; however, he submitted an assessment form dated September 15, 2005, which found Plaintiff was moderately impaired in his ability to pay attention, concentrate, and maintain an adequate work pace. No objective data were noted. (AR 234.)

Dr. Gerson ultimately opined that the medical record documentation did not indicate Plaintiff was impaired from working due to a psychological disorder, including major depression, anxiety or chronic pain syndrome, or from any substantial cognitive dysfunction. He stated no restrictions or limitations were required based on the medical record information, and no medication side effects were noted. He suggested that, based on symptoms delineated in the medical records, psychotherapeutic medications appeared to be appropriate. (AR 235.)

In a note to the file dated December 21, 2005, Dr. Gerson documented a telephone call he placed to Dr. Brauer. After reviewing Plaintiff's history, Dr. Brauer told Dr. Gerson that he did not

know what Plaintiff did all day, but he assumed Plaintiff could drive, handle a checkbook, work a computer, read, shop and do housework. Plaintiff's mental status was unremarkable. His affect was slightly flat and he had minimal insight, but cognitively he was intact. Dr. Brauer felt Plaintiff could move around in his office physically without difficulty and Plaintiff "just complains subjectively about pain." Dr. Brauer affirmed that he did not think Plaintiff was psychiatrically impaired after July 2004 because his subjective complaints of pain were not congruent with physical presentation or real limitations at that point. Dr. Brauer further stated the Plaintiff seemed to accept passively that Dr. Brauer did not see him as disabled. Dr. Gerson concluded that Dr. Brauer did not believe Plaintiff was impaired after July 2004; there were no severe difficulties with attention, concentration, or memory; and there were no indicators of severe depressive symptomatology such as psychomotor retardation or cognitive impairment. Plaintiff was functional day-to-day in his life and it was not evident to Dr. Brauer "directly why he couldn't perform the functions of his job after May 3, 2004." (AR 236.) Dr. Gerson opined that Plaintiff did not demonstrate psychiatric impairment. (AR 237.)

On January 11, 2006, Prudential denied Plaintiff's request for reconsideration of the termination of long-term disability benefits and upheld the termination. (AR 150-154.) Prudential's denial letter stated that the applicable Plan standards were whether Plaintiff could perform the duties of any "reasonable occupation" for which Plaintiff was qualified or could become qualified based on his education, training or experience. Based on the two independent medical reviews by Dr. Syrjamaki and Dr. Gerson, Prudential concluded that Plaintiff retained the ability to perform any "reasonable occupation" as there was insufficient information to substantiate a functional or psychiatric impairment beyond May 17, 2005, and there was "insufficient evidence of any abnormality on exam that would support [Plaintiff's] subjective pain complaints." (AR 153.)

18

Prudential further stated it had concluded that the self-reported provision of the Plan was applicable to Plaintiff's self-reported symptoms of pain.  (Id.)

On June 15, 2006, Dr. Light of the San Francisco Spine Center again examined Plaintiff, after first seeing him in January 2005.  Plaintiff complained of pain radiating into his right foot and into the anterolateral part of his left thigh.  Plaintiff reported his right foot was so painful that it burned and he was not able to wear a sock.  On examination, Dr. Light determined that Plaintiff's left calf was 2 centimeters smaller than his right, which the doctor found to be significant.  Dr. Light concluded that Plaintiff suffered from neurogenic pain syndrome likely due to some type of neuropathy.  He found Plaintiff's symptoms to be severe and disabling and Plaintiff would be unable to work even at a light duty job due to severe neurogenic pain.  Dr. Light recommended repetition of EMG/NC studies.  (AR 105.)

On June 17, 2006, Dr. Grinberg, a psychiatrist, completed a Psychiatric Asssessment. Plaintiff had been under his care for six months and was taking Effexor and Seroquel.[20]  Plaintiff's diagnosis was major depressive disorder, recurrent episodes with psychotic features.  He reported Plaintiff had no energy and motivation to complete necessary tasks and chores, he was increasingly socially isolated, he engaged in compulsive/repetitive movements, his affect was restricted and anxious, and his concentration was poor.  Dr. Grinberg thought Plaintiff's insight and judgment were impaired because Plaintiff reported he had no or minimal mental problems.  Plaintiff's mood was sad, and he was preoccupied with radiculopathy/pain.  Dr. Grinberg opined that Plaintiff had severe behavioral/emotional disturbances and preoccupation that would interfere with his ability to adapt to workplace stress; his constant intrusive need to readjust his body was likely to interfere with his ability to behave in an emotionally stable manner; and all of this plus his anxiety and restlessness

[20]Used to treat bipolar disorder.

19

would likely interfere with his ability to sustain an ordinary routine without special supervision or reminders. He also opined that all of the previous considerations plus Plaintiff's fatigue and pain could adversely affect his ability to maintain regular work attendance; Plaintiff had physical and mental impairments that were reasonably likely to interfere with his ability to consistently maintain concentration, persistence and pace in performing at least simple tasks; and his severe behavioral disturbances were likely to interfere with his ability to interact with co-workers, supervisors, and the general public. In his opinion, Plaintiff's nonexertional limitations began two to three years earlier. (AR 106-108.) As of July 7, 2006, Plaintiff's current medications were Vicodin, Flexeril, Neurontin, and Seroquel. (AR 110-122.)

On July 7, 2006, Plaintiff's attorney sent another appeal to the Nortel Networks Employee Benefits Committee contending that Plaintiff was totally disabled from any reasonable occupation because of his physical impairments and that Prudential's termination of benefits was arbitrary and capricious given the abundant medical evidence of disability and the policy definitions. Plaintiff argued that his medical records showed he had bilateral L4-5 degenerative disc disease, lumbar radiculitis, cervical radiculopathy, neuropathy, and left cubital tunnel syndrome, as well as severe major depressive disorder secondary to his physical impairments. Plaintiff submitted copies of medical records and reports from November 24, 2003 through June 17, 2006. Plaintiff highlighted Dr. Gracer's functional capacity questionnaire of August 19, 2005, in which he reported that Plaintiff was unable to sustain any full-time work because Plaintiff could sit for only 20 minutes at a time, stand for only 20 to 30 minutes at a time and required an opportunity to lie down for 10 to 30 minutes 2 to 4 times a day. Plaintiff also highlighted Dr. Gracer's February 29, 2005 attending physician's statement which reported that Plaintiff's functional abilities qualified him for no occupation, and Dr. Gracer's opinion rested on "specific measurable or observable objective

20

findings" and not "self-reported" symptoms, as stated in the termination letter.  Further, Plaintiff pointed out Dr. Light's June 15, 2006 report stating that Plaintiff's symptoms were severe and disabling such that Plaintiff could not work at even a light duty job.  Finally, Plaintiff pointed out the physicians' objective medical findings that confirmed Plaintiff's self-reported complaints of pain.  (AR 59-64.)

The Committee reaffirmed the denial of benefits on October 3, 2006.  (AR 42-58.)  The Committee determined that medical and psychological information concerning the period after May 18, 2005 was not relevant to the determination whether Plaintiff was totally disabled under the Plan as of May 18, 2005, the day his long-term disability benefits were terminated.  The Committee determined:  long-term benefits were correctly terminated based on the medical information available prior to May 18, 2005; there was no significant change in Plaintiff's condition during the period when he received disability benefits; and the claim was based on self-reports of pain, yet the medical evidence did not support a finding that his medical condition was deteriorating or that more aggressive treatments were being undertaken to resolve the condition at the time benefits were terminated.  The Committee also decided that the medical information supported the claims administrator's right under the Plan provisions to limit the payment term for the LTD benefit; the independent physician file review indicated that, despite pain, Plaintiff could perform the functions of his own occupation, not just any "reasonable occupation" at the time his benefits terminated; and Plaintiff argued a disability standard (an "appropriate" occupation or one "befitting his education") that is different from the standard stated in the Plan (any "reasonable occupation").  Because long-term benefits were properly terminated, the Committee held that Plaintiff did not have current long-term disability plan coverage for a disabling condition as of June 15, 2006, because he had not

returned to active work and shown coverage for a subsequent disability. (Id.) Plaintiff then filed this action under ERISA to challenge the termination of his long-term disability benefits.

## II.  STANDARD OF REVIEW

The parties agree that the Plan gave the claims administrator discretionary authority to determine eligibility for benefits. As a result, this Court must apply the highly deferential "arbitrary and capricious" standard of review. Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Evans v. UnumProvident Corp., 434 F.3d 866, 875-876 (6th Cir. 2006). This standard is the least demanding form of judicial review of administrative action, and the Plan's decision to terminate Plaintiff's long-term disability benefits must "be upheld if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." Baker v. United Mine Workers of American Health & Retirement Funds, 929 F.2d 1140, 1144 (6th Cir. 1991).

A decision may be arbitrary or capricious if it lacks substantial evidence, reveals a mistake of law, or is made in bad faith. Caldwell v. Life Ins. Co. of North America, 287 F.3d 1276, 1282 (10th Cir. 2002). A decision is not arbitrary or capricious if it is rational in light of the Plan's provisions. Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 381 (6th Cir. 1996). The "arbitrary and capricious" standard of review "is not, however, without some teeth." McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir. 2003). Deferential review does not mean no review, and deference need not be abject. Id. The Court is obligated to review the quality and quantity of the medical evidence and opinions on both sides of the issue, McDonald, 347 F.3d at 172; however, the Court is confined to the record that was before the claims administrator. Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 615 (6th Cir. 1998). The ultimate issue is not whether discrete acts by the claims administrator were arbitrary and capricious, but whether the decision to deny benefits was arbitrary and capricious. Evans, 434 F.3d at 876.

Case 3:07-cv-01046   Document 28   Filed 01/20/09   Page 22 of 29 PageID #: 844

### III. ANALYSIS

The Court has carefully reviewed the administrative record summarized in this opinion in the light of factors the Court must take into consideration or is permitted to examine.  In evaluating this matter, the Court has kept in mind two conflicts of interest.  The first conflict of interest arose from Nortel Networks' self-funding of the Plan, even though contributions are held in trust, when the benefit decision on final appeal rested with the Nortel Networks Employee Benefits Committee. See Metropolitan Life Ins. Co. v. Glenn, — U.S. —, 128 S.Ct. 2343, 2346 (2008); Killian v. Healthsource Provident Admins., Inc., 152 F.3d 514, 521 (6th Cir. 1998).  The second conflict of interest arose when Prudential retained and paid a consulting physician and a consulting psychiatrist to review Plaintiff's claim file.  See Calvert v. Firstar Finance, Inc., 409 F.3d 286, 292 (6th Cir. 2005) (noting claims administrator had clear incentive to contract with individuals who were inclined to find in its favor that claimant was not entitled to long-term disability benefits, especially because claimant was young and paying long-term benefits would be expensive).  The Court concludes, among many other factors discussed below, that these inherent conflicts of interest may have influenced the Nortel Networks Employee Benefits Committee in reaching the final decision to terminate the payment of long-term disability benefits to Plaintiff on May 18, 2005.  If the Plan had determined that Plaintiff was totally disabled because he could not perform any "reasonable occupation," the decision to continue long-term disability benefits would have been quite expensive, as Plaintiff was then a young man in his early thirties.

Further, the Court concludes that the benefit termination decision was not the result of a principled reasoning process, nor was it supported by substantial evidence, and as a result the decision was arbitrary and capricious.  The Court cannot say on the evidence presented in the administrative record that Plaintiff was entitled to long-term disability benefits under the Plan as of

May 18, 2005, and thus, the Court will not award benefits outright. The Court will, however, remand the case to the Plan for a proper determination of whether Plaintiff was entitled to long-term disability benefits on and after May 18, 2005, under the any "reasonable occupation" standard of the Plan. See Elliott v. Metropolitan Life Ins. Co., 473 F.3d 613, 622 (6th Cir. 2006).

Between November 13, 2003, when Plaintiff stopped working and short-term disability benefits began, and May 18, 2005, when long-term disability benefits stopped, Plaintiff visited various doctors, underwent a number of medical tests, and obtained a range of medical treatments for his conditions. The Court agrees with the Plaintiff that he produced an anatomical explanation for at least part of his subjective complaints of pain. See Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 382 (6th Cir. 1996). The November 24, 2003 MRI and the May 25, 2004 L4-5 discogram established that Plaintiff's lumbar pain originated from degenerative changes in the L4-5 disc with impingement and mild displacement of the L4 nerve root. The August 19, 2004 EMG established mild bilateral chronic L4 lumbar radiculopathy with mild denervation, as well as chronic right C5 cervical radiculopathy with mild persistent denervation. See Oliver v. Coca Cola Co., 497 F.3d 1181, 1199 (11th Cir. 2007) (EMGs and nerve conduction tests supported finding of disability where MRI was inconclusive), *reh'g granted, vacated in part on other grounds*, 506 F.3d 1316 (11th Cir. 2007), *adhered to in part on reh'g*, — F.3d — 2008 WL 4742633 (11th Cir. Oct. 30, 2008).

Plaintiff's treating pain management specialist, Dr. Gracer, opined in an Attending Physician's Statement dated February 28, 2005, three months before long-term benefits were terminated, that Plaintiff was limited to sitting 1 hour, standing 1 hour, and walking 2 hours out of an 8-hour work day, all with rest as opposed to continuous activity. At that time Dr. Gracer believed that Plaintiff could not perform any job, from sedentary to very heavy. Dr. Gracer's opinion in February 2005 was only very slightly improved from his earlier view in April 2004 that Plaintiff

24

could sit ½ hour, stand 1 hour, and walk 2 hours out of an 8-hour day. Dr. Gracer's determination was based on objective medical testing that confirmed Plaintiff's physical conditions and the source of his lumbar and cervical pain, as well as on Plaintiff's ongoing reports of pain.

Prudential credited Dr. Gracer's April 2004 opinion to award Plaintiff long-term disability benefits starting May 18, 2004. Yet, one year later, Prudential did not consider all of Dr. Gracer's February 2005 Work Status Form. Prudential focused only on the portions of the "Work Status Form" that were helpful to the Plan. Prudential emphasized Plaintiff could lift and carry up to 20 pounds occasionally; climb, bend, kneel, squat, crawl, and reach occasionally; balance frequently; and grasp, push and pull occasionally. Prudential even acknowledged that Dr. Gracer felt Plaintiff was unable to engage in fine manipulation. Based on the medical information reviewed, Prudential decided these restrictions and limitations were reasonable given the EMG findings. Yet, Prudential completely failed to mention the other limitations Dr. Gracer decribed, including ability to sit 1 hour, stand 1 hour, and walk 2 hours, all with rest, in an 8-hour work day, with no functional capacity to do any level of work, from sedentary to heavy. Instead of confronting this information in Plaintiff's favor, Prudential determined that Plaintiff could perform his prior job as a systems engineer, which Prudential classified as "light" work. Interestingly, Prudential noted that "light" work requires sitting most of the time with standing 4 to 8 hours and walking 0 to 4 hours in an 8-hour day. Prudential determined that the restrictions and limitations described by Dr. Gracer supported a finding that Plaintiff was capable of "light" work. But this is simply not true, as Dr. Gracer stated Plaintiff could not stand 4 to 8 hours a day. Prudential could reach the conclusion that Plaintiff was capable of "light" work only by ignoring those portions of Dr. Gracer's opinion as treating physician that were favorable to Plaintiff. Additionally, Dr. Gracer determined there was an anatomical explanation for Plaintiff's subjective complaints of pain and that these pain complaints were not

25

merely "self-reported." Nonetheless, Prudential applied the "self-reported" symptoms limitation of the Plan to determine that no further benefits were payable for chronic pain complaints.

A claims administrator is "not obliged to accord special deference to the opinions of treating physicians." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003). But the claims administrator may not arbitrarily refuse to credit reliable evidence, including the opinions of a treating physician. Id. at 834; Smith v. Continental Cas. Co., 450 F.3d 253, 262 (6th Cir. 2006).

A second error occurred when Dr. Syrjamaki, a specialist in internal medicine and occupational medicine, reviewed Plaintiff's claim file at Prudential's request during the first-level appeal. There is nothing inherently wrong with a file review by a qualified physician in the context of a benefits determination. Calvert, 409 F.3d at 296. But the problem here is that, although Dr. Syrjamaki specifically stated in his report that he had reviewed medical records from Dr. Gracer, he summarily determined that Plaintiff did not have any functional impairments and that he could do his entire job as a systems engineer without restriction. Dr. Syrjamaki stated: "There are no restrictions in his ability to sit, stand, walk, lift, reach, or carry." (AR 252.) This was not consistent with the medical evidence. Dr. Gracer reported that Plaintiff's back conditions and pain restricted him to sitting 1 hour, standing 1 hour, and walking 2 hours, all with rest, in an 8-hour work day. Dr. Syrjamaki did not contact Dr. Gracer to discuss the case with him, and he did not explain why Dr. Gracer's opinion as treating physician should be ignored and discounted. See Calvert, 409 F.3d at 297 (reversing and remanding for award of benefits where non-examining, consulting physician ignored conclusions reached by treating physicians and himself reached incredible determination). Having not examined Plaintiff himself, Dr. Syrjamaki did not have the same clinical experience with the Plaintiff as Dr. Gracer, who had been treating him for many months.

26

Additionally, Dr. Syrjamaki questioned the credibility of Plaintiff's complaints of pain without the benefit of an examination.  See Smith v. Continental Casualty Co., 450 F.3d 253, 263-264 (6th Cir. 2006) (finding conclusion that symptoms were out of proportion to physical findings was credibility determination made without benefit of physical examination and as such, supported a finding that denial of benefits was arbitrary and capricious).  The Plan certainly contained a "self-reported" symptoms limitation on the payment of long-term benefits, but Prudential did not avail itself of its right under the Plan to obtain an Independent Medical Examination ("IME") that involved a physical examination of the Plaintiff.  (AR 20.)  See Platt v. Walgreen Income Protection Plan for Store Managers, 455 F.Supp.2d 734 (M.Tenn. 2006) (this Court reversed and remanded as arbitrary and capricious a plan administrator's decision to terminate a claimant's long-term disability benefits without first obtaining an IME as provided by the Plan); Kalish v. Liberty Mut./Liberty Life Assur. Co., 419 F.3d 501, 508 (6th Cir. 2005) ("Whether a doctor has physically examined the claimant is indeed one factor that [this Court] may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician."); Calvert, 409 F.3d at 295 ("the failure to conduct a physical examination–-especially where the right to do so is specifically reserved in the plan–-may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination."); McDonald, 347 F.3d at 163-164 (where medical consultants believed some of claimant's activities were inconsistent with diagnosis of major depression, Western-Southern asked claimant to submit to independent medical examination to determine if he remained eligible for long-term disability benefits).  Such an examination likely could have provided information to Prudential about the extent of Plaintiff's pain. Instead, Prudential simply relied on its paid medical file consultation with Dr. Syrjamaki to discredit

Plaintiff's complaints of pain, ignore Dr. Gracer's limitations and restrictions, and uphold its decision to deny long-term benefits.

The Nortel Networks Employee Benefit Committee similarly relied on Dr. Syrjamaki's consultation to reject Plaintiff's final appeal. Despite Dr. Gracer's evaluation, the Committee found that Plaintiff could perform the duties of his prior occupation, even though the claims administrator had found in May 2004 that Plaintiff could not perform the duties of his prior occupation and awarded long-term benefits on that basis. These actions on the part of Prudential and the Committee were arbitrary and capricious and not supported by substantial evidence.

Dr. Gerson's evaluation of Plaintiff's psychological complaints was more thorough in that it included a direct conversation with Plaintiff's treating psychiatrist, Dr. Brauer. Dr. Brauer essentially told Dr. Gerson that he did not believe Plaintiff was totally disabled due to psychological difficulties. Plaintiff himself does not appear to be arguing that he is totally disabled based solely on psychological issues; rather, he views such problems as secondary to his physical conditions and complaints of pain. Prudential's determination that Plaintiff's psychological issues were not in and of themselves disabling appears to be supported by substantial evidence in the record and was not arbitrary and capricious.

The administrative record contains some evidence suggesting that Plaintiff may have exaggerated his complaints of pain to some extent and certainly this is a factor the claims administrator may consider in determining whether Plaintiff is totally disabled from any "reasonable occupation." Plaintiff's physical conditions, along with his ongoing pain, may well not be so severe in nature as to be totally disabling under the standard set out in the Plan. It is not for this Court to say whether Plaintiff is totally disabled under the Plan or not, as that discretion is placed in the claims administrator, and the Court is not entirely convinced that Plaintiff was denied benefits to

28

which he was clearly entitled.  See Elliott, 473 F.3d at 622.  The Court is concerned, however, with the integrity of the decision-making process utilized to terminate long-term disability benefits.  See id.  The Court concludes that the decision to terminate benefits was not the result of a deliberative, principled reasoning process, but rather ignored relevant medical information in Plaintiff's favor without explaining rationally why that information must be discounted.  For this reason, the Court will remand the case to the Plan for a full and fair inquiry in accordance with Sixth Circuit precedent.  See id.

## IV. CONCLUSION

For all of the reasons stated, the Court determines that Plaintiff's Motion for Judgment on the ERISA Record (Docket Entry No. 14) will be granted.  Defendant's Motion for Judgment on the Administrative Record (Docket Entry No. 16) will be denied.  The final decision of the Nortel Networks Employee Benefits Committee to terminate Plaintiff's long-term disability benefits effective May 18, 2005, will be reversed and the matter remanded for a full and fair inquiry into whether Plaintiff was totally disabled under the Plan effective May 18, 2005.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE